**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DONNA GEIGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15-cv-3791 |
| v. | ) | |
| | ) | Hon. Amy J. St. Eve |
| AETNA LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the parties' cross-motions for summary judgment pursuant to

Federal Rule of Civil Procedure 56(a). (R. 39, R. 47.) Plaintiff Donna Geiger ("Ms. Geiger")

seeks a declaratory judgment that Defendant Aetna Life Insurance Company ("Aetna")

arbitrarily and capriciously terminated her long-term disability benefits in violation of the

Employee Retirement Insurance Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* (R. 39.)

Aetna, however, also seeks a declaratory judgment that it terminated Ms. Geiger's long-term

disability benefits after a full and fair review, in accordance with the ERISA. (R. 47.) For the

following reasons, the Court grants Aetna's cross-motion for summary judgment and denies Ms.

Geiger's motion.

## BACKGROUND

Ms. Geiger is a 51 year-old woman who resided, at all relevant times, in Mount Prospect,

Illinois. (R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶ 6.) Ms. Geiger worked as an account

executive for Sprint Nextel from 2001 to 2009. (*Id.* at ¶ 12) Aetna, a life insurance company,

issued and was the underwriter of an employee welfare benefit plan between Aetna and the

Sprint/United Management Company (the "Plan"). (R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 3.)

Ms. Geiger seeks, in part, to regain her long-term disability benefits under the Plan. (*Id*. at ¶ 4.)

## I. The Plan

The Plan provides, in relevant part, the following discretionary authority:

**ERISA Claim Fiduciary:**

For the purpose of section 503 of Title 1 of the Employee Retirement Income Security Act of 1974, as amended (ERISA), Aetna is a fiduciary with complete authority to review all denied claims for benefits under this policy. In exercising such fiduciary responsibility, Aetna shall have discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this Policy.

Aetna shall be deemed to have properly exercised such authority unless Aetna abuses its discretion by acting arbitrarily and capriciously.

(*Id*. at ¶ 5.) The Plan also defines the following relevant terms as follows:

**Test of Disability:**

From the date that you first become disabled and until Monthly Benefits are payable for 24 months, you will be deemed to be disabled on any day if:

- You are not able to perform the **material duties** of your **own occupation** solely because of: disease or **injury**;
- and your work earnings are 60% or less of your **adjusted predisability earnings**.

After the first 24 months that any Monthly Benefit is payable during a period of disability, you will be deemed to be disabled on any day if you are not able to work at any **reasonable occupation** solely because of:

- Disease; or
- **Injury**.

**Material Duties:**

These are duties that:

- are normally required for the performance of your own occupation; and
- cannot be reasonably: omitted or modified. However, to be at work in excess of 40 hours per week is not a material duty.

**Own Occupation:**

This is the occupation that you are routinely performing when your period of disability begins.  Your occupation will be viewed as it is normally performed in the national economy instead of how it is performed:

- for your specific employer; or
- at your location or work site; and

without regard to your specific reporting relationship.

**Injury:**

An accidental bodily injury.

**Reasonable Occupation:**

This is any gainful occupation for which you are, or may reasonably become, fitted by: education; training; or experience; and which results in; or can be expected to result in; an income of more than 60% of your **adjusted predisability earnings**.

**Adjusted Predisability Earnings:**

This is your **predisability earnings** plus any increase made on each January 1, starting on the January 1 following 12 months of the period of disability.  The increase of the **Consumer Price Index**, rounded to the nearest tenth; but not more than 10%.

**Predisability Earnings:**

This is the amount of salary or wages you were receiving from an employer participating in this Plan on the day before a period of disability, calculated on a monthly basis.

It will be figured from the rule below that applies to you.

If you are paid on an annual contract basis, your monthly salary is $1/12^{th}$ of your annual contract salary.

If you are paid on an hourly basis, the calculation of your monthly wages is based on the average number of hours you worked per month during the last 12 calendar months (or during your period of employment fewer than 12 months); but not more than 173 hours per month.

**Consumer Price Index:**

The CPI-W, Consumer price index for Urban Wage Earners and Clerical Workers is published by the United States Department of Labor. If the CPI-W is discontinued or changes, Aetna reserves the right to use a comparable index.

**A Period of Disability:**

A period of disability starts on the first day you are disabled as a direct result of a significant change in your physical or mental condition occurring while you are insured under this Plan. You must be under regular care of a physician. (You will not be deemed to be under the regular care of a physician more than 31 days before the date he or she has seen and treated you in person for the disease or injury that caused the disability.) Your period of disability ends on the first to occur of:

- The date Aetna finds you are no longer disabled or the date you fail to furnish proof that you are disabled.
- The date Aetna finds that you have withheld information which indicates you are performing, or are capable of performing, the duties of a reasonable occupation. ***
- The date you refuse to receive treatment recommended by your attending **physician** that in Aetna's opinion would: cure; correct; or limit your disability.

**How and When to Report a Claim:**

You are required to submit a claim to Aetna by following the procedure chosen by your Employer. If the procedure requires that claim forms be submitted, they may be obtained at your place of employment or from Aetna. Your claim must give proof of the nature and extent of the loss. Aetna may require copies of documents to support your claim, including data about any other income benefits. You must also provide Aetna with authorizations to allow it to investigate your claim and your eligibility for and the amount of other benefits.

You must furnish such true and correct information as Aetna may reasonably require.

The deadline for filing such claims is 90 days after the end of the elimination period[, the first 180 days of a period of disability.]

**Filing an Appeal of an Adverse Benefit Determination for a Disability Claim:**

You will have 180 days following receipt of an adverse benefit decision to appeal that decision. You will ordinarily be notified of the decision not later than 45 days after the appeal is received. If special circumstances require an extension of

time of an additional 45 days, you will be notified of such extension during the 45 days following the receipt of your request. This notice will indicate the special circumstances requiring an extension and the date by which a decision is expected.

(*Id.* at ¶¶ 5–14; R. 46-1, Admin. Rec., at 94–96; R. 46-2, Admin. Rec., at 6–11.)

## II.     Factual Background

Having reviewed the applicable policy provisions, the Court turns its focus to the additional undisputed facts bearing on the present summary judgment motions.

### A.     Ms. Geiger's Long-Term Disability Benefits Claim

On October 6, 2009, Ms. Geiger ceased working at Sprint Nextel and claimed a disability stemming from "lumbar back pain with subsequent L5-S1 discectomy and bilateral ankle pain with evidence of avascular necrosis of the talar bones bilaterally." (R. 46-4, Admin. Rec., at 80; R. 51, Geiger 56.1(a)(3) Stmt. Facts, at ¶ 13; Aetna 56.1(a)(3) Stmt. Facts, at ¶ 15.) On October 22, 2009, Dr. Ami Kothari confirmed Ms. Geiger's diagnosis, reporting the impression that Ms. Geiger presented "avascular necrosis of the right talus" and "bilateral ankle pain." (R. 46-9, Admin. Rec., at 185.) Ultimately, in October 2009, Sprint Nextel approved Ms. Geiger's short-term disability claim. (*Id.* at 155; R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶ 16.)

On January 14, 2010, Ms. Geiger underwent ankle surgery on both ankles with Dr. Alan League at Advocate Lutheran General Hospital. (R. 46-8, Admin. Rec., at 50–52; R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶ 17.) On April 5, 2010, Ms. Geiger attended a follow-up appointment with Dr. James DeOrio at Duke University Medical Center. (R. 46-9, Admin. Rec., at 106–08; R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶ 17.) Dr. DeOrio diagnosed Ms. Geiger with "bilateral talar avascular necrosis" and suggested she attend a follow-up appointment in six months and consider an "ankle and/or subtalar fusion in combination or ankle replacement with or without a subtalar fusion." (*Id.*) On December 16, 2010, Ms. Geiger underwent a left ankle arthroscopy

and full ankle replacement but failed to follow up with the surgeon. (R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 20; R. 46-5, Admin. Rec., at 197.) Further, Ms. Geiger did not undergo a recommended right ankle arthroscopy. (*Id*.) Later, other doctors suggested Ms. Geiger return to Duke University Medical Center for the surgery, but Ms. Geiger communicated to Aetna on April 4, 2012 that she did not want the surgery. (*Id*.; R. 46-2, Admin. Rec., at 166.)

On April 22, 2010, after Ms. Geiger's short-term disability benefits with Sprint Nextel expired, Aetna approved Ms. Geiger's claim for long-term disability benefits. (R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶ 18; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 19; R. 46-3, Admin. Rec. at 170–72.) Aetna concluded that Ms. Geiger was disabled from her own occupation as an account executive under the Plan. (*Id*.) Aetna's claim notes document the reason for Ms. Geiger's benefit approval, stating "Functionality vs. Workability: DUE TO BILATERAL AVASCULAR NECROSIS IN ANKLES, WHICH CAUSED CLMNT SEVERE PAIN. SHE IS UNABLE TO PERFORM OCCUPATIONAL DUTIES AS AN ACCOUNT EXECUTIVE BECAUSE CLMNT IS UNABLE TO DO THE REQUIRED WALKING AND DRIVING FOR THIS OCCUPATION." (R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶ 18; R. 46-2, Admin. Rec., at 62.) As a result, Ms. Geiger was "eligible to receive monthly benefits effective 4/4/2010, and continuing for up to 24 months as long as you remain disabled from your own occupation." (R. 46-3, Admin. Rec. at 170–72.) Notably, Aetna informed Ms. Geiger that "your plan requires that [Aetna] periodically re-evaluate your eligibility by requesting updated medical information from your physician or an independent physician of [Aetna's] choice. Also, you may be contacted by a Vocational Rehabilitation Consultant and asked to participate in a vocational assessment interview. If [Aetna] determine[s] that you are capable of performing the material duties of your own occupation, your monthly benefits will cease." (*Id*. at 171.) Under the Plan, Aetna

approved Ms. Geiger for a monthly benefit amount of $4012.65, or fifty percent of Ms. Geiger's pre-disability earnings.  (*Id*. at 171; R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶ 18.)

Additionally, in April 2010, the Social Security Administration approved Ms. Geiger's request for Social Security benefits for herself and her dependent minor son, born in 1997.  (R. 46-9, Admin. Rec., at 8–15; R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶¶ 19–20.)  As a result, Aetna reduced Ms. Geiger's monthly long-term disability payments to $784.65.  (R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶¶ 19–20.)

### B.    Aetna's First Termination

On August 20, 2012, after her initial twenty-four month period of long-term disability benefits expired, Aetna informed Ms. Geiger that she "no longer me[t] the definition of disability."  (R. 46-4, Admin. Rec., at 23; R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶ 22.) Specifically, Aetna stated that "the medical documentation received to date does not support your inability to perform your occupation as an Account Executive[,] and an Independent Medical Evaluation as well as your provider Dr. Bukhalo all indicate that you are functionally able to do your occupation."  (*Id*. at 25.)  Indeed, on May 31, 2012, Dr. Herbert White conducted an Independent Medical Evaluation of Ms. Geiger.  (R. 46-6, Admin. Rec., at 51–59.)  After reviewing her medical history and conducting a physical examination, Dr. White concluded, in part, that

> [b]ased upon my physical evaluation[,] I feel she is able to perform sedentary work constantly as long as the work does not require anything more than minimal walking or standing.  She should be limited to no walking or standing more than 20 minutes per day.  She requires an assistance device to ambulate.  She would be limited in lifting due to the additional stress on the feels [sic] and her feet and ankles with lifting heavy objects.

> She should have a gradual return to work in two hour intervals increasing by 2 hours every week.  She should not work more than eight hours a day.  These restrictions are current in her current condition.  It is anticipated that her condition

will worsen if she does not receive definitive treatment for her Right aseptic
Necrosis of Talar Head.  These restrictions are considered permanent based on the
poor response to the left inbone total ankle arthroplasty.

(*Id*. at 59.)  Aetna terminated Ms. Geiger's long-term disability benefits, effective August 18,

2010.  (R. 46-4, Admin. Rec., at 25.)

On February 15, 2013, Ms. Geiger appealed Aetna's decision.  (R. 41, Geiger 56.1(a)(3)

Stmt. Facts, at ¶ 23; R. 46-6, Admin. Rec., at 168–182.)  In her appeal, Ms. Geiger included, in

part, a number of medical records, medical imaging, pain and functional capacity evaluations,

various doctor diagnoses and reports, and witness statements.  (*Id*.)

On May 1, 2013, Aetna overturned its August 2012 decision and reinstated Ms. Geiger's

long-term disability benefits.  (R. 46-4, Admin. Rec., at 50.)  Aetna, as part of its review process,

engaged both Dr. Malcolm McPhee and Dr. Robert Cirincione to separately conduct independent

physician peer reviews of Ms. Geiger's medical files.  (R. 46-5, Admin. Rec., at 192–99; R. 46-

6, Admin. Rec., at 2–8.)  On April 15, 2013, Dr. McPhee opined that "the claimant's bilateral

ankle condition would not preclude sedentary work activity."  (R. 46-6, Admin. Rec., at 7.)

Further, Dr. McPhee spoke with Dr. Yurily Bukhalo, Ms. Geiger's anesthesiologist.  (*Id*.)

According to Dr. McPhee, they "discussed the claimant's history[,] and I asked about functional

capacity and if sedentary work activity for an eight hour work day would be reasonable.  Dr.

Bukhalo stated that this was very reasonable adding that allowance for change of position from a

seated position to avoid prolonged sitting would be advisable."  (*Id*.; R. 46-3, Admin. Rec. at 82–

83.)  "Based on the provided documentation, and telephonic consultation[,]" Dr. McPhee

concluded, "a reasonable estimate of the physical demand level (PDL) of work would be

sedentary that the claimant can likely perform from 8/18/2012 through 5/31/2013."  (*Id*.)  On

April, 24 2013, however, Dr. Cirincione, after failing to reach Ms. Geiger's surgeon, reported, in

relevant part, that, "[b]ased on provided documentation[,] I do not believe that claimant could have performed any [work,] including sedentary[,] from 8/18/2012 to 5/31/2013 based on the claimant's recommendation that [she be] non-weightbearing or at least partial weightbearing with cane or assistive devices during the [relevant period] of time." (R. 46-5 at 198; R. 46-3, Admin. Rec., at 82–83.)

Eventually, on May 1, 2013, Aetna stated that, "[b]ased upon our review of all of the information submitted and gathered during the claim and appeal, we have overturned our original decision to terminate your client's benefits." (R. 46-4, Admin. Rec., at 50.) Aetna specified that this "determination [was] based on sufficient medical evidence to support a functional impairment which precluded the employee from performing the material duties of her own occupation[.]" (*Id*. at 51.) "As a result," Aetna concluded, "her claim has been returned to the claims operation team and will be re-opened by the assigned Disability Benefits Manager (DBM) for review and benefits payment, effective August 18, 2012." (*Id*. at 50.) These benefits were subject to termination. Ms. Geiger had to continue to qualify as disabled under the Plan's "Test of Disability," defined above, she had to remain under the care of a licensed physician appropriate for her condition, and Aetna reserved the right to "continue to monitor [her] disability status by periodically requesting updated medical and/or other documentation to verify [her] continued eligibility for Long-Term Disability benefits." (*Id*. at 53.) Ultimately, Aetna concluded that Ms. Geiger met the "definition of being totally disabled from any gainful occupation" and continued her long-term disability benefits "beyond the 24 Months mark, or 04/04/2012." (*Id*.)

### C.     Aetna's Second Termination

Later, on May 28, 2014, however, Aetna informed Ms. Geiger that it had again terminated her long-term disability benefits claim. (R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 22; R. 46-4, Admin. Rec., at 80–83.) The May 2014 letter, in part, detailed to Ms. Geiger that she had to continue to be disabled from performing any reasonable occupation after the first 24 months of a period of disability for her benefits to continue. (*Id*. at ¶ 23; R. 46-4, Admin. Rec., at 80.) The letter concluded that, "[a]t this time, . . . we have determined that you are no longer disabled from performing any reasonable occupation and you [sic] claim is closed effective 5/27/2014." (R. 46-4, Admin. Rec., at 82.) Aetna also informed Ms. Geiger that, as a result of its May 27, 2014 termination, Aetna had overpaid Ms. Geiger by $104.62. (*Id*. at 85.) Aetna's letter highlighted a number of reasons for the second termination as described below.

### 1.     December 2013 and January 2014 Video Surveillance and Telephone Interview

Aetna first informed Ms. Geiger that Aetna had conducted physical activity surveillance on December 14, 17, and 18, 2013 and January 2014. (*Id*. at 81.) Specifically, Aetna reported to Ms. Geiger that

> [d]uring surveillance on 12/14/2013, 12/17/2013, and 12/18/2013, you were observed active. You demonstrated the ability to operate a motor vehicle on numerous occasions. You were observed climbing in and out of a Sport Utility Vehicle, as the driver. You shopped at multiple department stores and were observed walking at a normal pace with a normal gait. You carried a shopping bag and were observed pushing. Throughout the course of surveillance, you demonstrated no outward signs of pain or discomfort.

(*Id*.; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 27.)[1]

---

[1] The Court has also viewed Aetna's physical activity surveillance videos capturing Ms. Geiger's whereabouts and activities on December 14, 17, and 18, 2013 and January 2014. (*See* Surveillance Video, Case No. 15-cv-03791, Bates Stamp No. 0717.)

Additionally, Aetna's letter summarized Aetna's telephone interview with Ms. Geiger on January 31, 2014 in which the parties, in part, discussed Ms. Geiger's activity levels. (R. 46-4, Admin. Rec., at 81.) According to the letter, Ms. Geiger "reported [she] can walk somewhat, but not very well. [She] reported [she does] not go anywhere much. [She] advised [her] son drives most of the time. [She] claimed [she] can drive, but [she] do[es] not go far. [She] claimed most of the time, [she] keep[s] [her] ankles elevated and [she] do[es] not go anywhere unless [she] ha[s] to." (*Id*.; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 26.)

## 2. Attending Physician Statement and Independent Peer Reviews

Aetna's letter expressed to Ms. Geiger that Dr. Debjani Roy, one of Ms. Geiger's attending physicians, completed an "Attending Physician Statement" for Aetna on January 17, 2014. (*Id*.; R. 46-5, Admin. Rec., at 129–32.) Dr. Roy confirmed Ms. Geiger's diagnosis, reporting that she suffered from "avascular necrosis" and "chronic pain." (R. 46-5, Admin. Rec., at 129.) Further, Dr. Roy reported that Ms. Geiger had "[n]o ability to work; [a s]evere limitation of functional capacity; [and was] incapable of minimal activity[.]" (*Id*. at 130.) According to Aetna's letter to Ms. Geiger, however, Dr. Roy "provided no measurable clinical documentation to support his recommendation. Dr. Roy also failed to provide any specific restrictions or limitations." (R. 46-4, Admin. Rec., at 81; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 25.) Further, Aetna assessed Dr. Roy's evaluation in light of the previous "peer review" reports it received from independent medical doctors. Specifically, Aetna's letter stated that at least two "Peer Reviews concluded you would be capable of sedentary level work on a full time basis." (*Id*.) Addressing one Peer Review to the contrary—Dr. Cirincione's report described earlier—Aetna's letter informed Ms. Geiger that

> [o]ne of the Peer Reviews stated you would be precluded from performing full-
> time sedentary work due to partial non-weight bearing [sic]. Since the time of

these evaluations, we have conducted surveillance and have updated the medical documentation in your claim file.  You have been observed performing activities consistent with at least sedentary level functionality.

(*Id*.)

### 3.    Comprehensive Clinical Review

As a result of these conflicting reviews and the newly obtained evidence, Aetna informed Ms. Geiger that, on April 7, 2014, Aetna submitted her updated medical file claim report for a "comprehensive clinical review."  (*Id*.; R. 46-3, Admin. Rec., at 72–83.)  Indeed, Aetna tasked Ms. Judy Tierney, R.N. with reviewing Ms. Geiger's entire medical file in an effort to resolve, in part, "inconsistent information."  (R. 46-3, Admin. Rec., at 72.)  According to Ms. Tierney's report, Ms. Tierney reviewed, in part, Ms. Geiger's medical history, Aetna's physical activity surveillance, Aetna and Ms. Geiger's telephone interview, Aetna's independent physician peer reviews, attending physician statements, and Ms. Geiger's claim history from 2009 to around January 2014.  (*Id*. at 77–78.)  Ultimately, Ms. Tierney concluded that the file supported Dr. McPhee's April 15, 2013 independent physician peer review, stating that "[t]he available medical would not support impairment greater than the reviews provided by Dr. McPhee and the claimant's pain management provider, Dr. Bukhalo on 4/12/13."  (*Id*. at 83.)  As noted earlier, Dr. McPhee concluded in his April 15, 2013 peer review report that Ms. Geiger was capable of performing eight-hour workdays at a sedentary work level.  (R. 46-6, Admin. Rec., at 7.)  Aetna's letter to Ms. Geiger described Ms. Tierney's conclusion, stating "[t]aken together, the available documentation failed to support a level of impairment that would preclude you from lifting or carrying up to ten pounds, standing and walking occasionally, squatting and crouching occasionally, and using your hands to handle and finger unrestricted."  (R. 46-4, Admin. Rec., at 81.)

### 4.     Transferrable Skills Assessment

In addition, Aetna's May 2014 termination letter informed Ms. Geiger that, on April 24, 2014, Aetna conducted a "Transferrable Skills Assessment to determine whether other reasonable sedentary occupations exist in your labor market for which you are suited by training, education[,] and work history." (*Id.*; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 34.) Indeed, Ms. Janet Clifton conducted a "TransReview" for Ms. Geiger at Aetna's direction. (R. 46-3, Admin. Rec., at 84–88.) Ms. Geiger has a high school diploma and two years of college. (R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶ 30.) Ms. Clifton's assessment considered, in part, Ms. Geiger's work history as an Account Executive and her job duties from 2001 to 2009. (R. 46-3, Admin. Rec., at 85.) Nothing in the record shows that Ms. Geiger has any occupational experience in either the human resources or agricultural fields. (R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶ 30.) Finally, the assessment, relying, in part, on the April 5, 2013 independent physician peer review report and April 2014 comprehensive clinical review, noted the following functional capabilities for Ms. Geiger:

> Sedentary work activity for an 8 hour day; reasonable restrictions would allow lift/carry 10 pounds occasionally and less than 10 pounds frequently; stand/walk occasionally; squat/crouch occasionally; hand use including handling and fingering would be unrestricted. Allowance for change of position to avoid prolonged sitting would be advisable.

(R. 46-3, Admin. Rec., at 84–85.) According to the assessment, Ms. Geiger had the following transferrable skills: "[m]ak[ing] decisions and judgments[;] [i]nfluencing people in their opinions, attitudes, and judgments[;] [d]ealing with people[; and] [c]omputer skills[.]" (*Id.* at 86.) Further, the assessment reported that,

> [u]sing the functional capacity, past work history[,] and education outlined above, the VRC used OASYS software to perform a transferable skills analysis. Results were generated using fair and potential matches with the wage filter set at

reasonable wage of $30.16/hr[.] . . . Geographical area included 100 mile radius of Mt. Prospect, IL.

The specific vocational preparation was set at 1-6 and the physical abilities for Sedentary with no lifting/pushing/pulling/carrying over 10 lbs. Occasional stand, walk, squat, crouch[,] and no restrictions with hands. OASYS yielded two matches; both at the fair level. . . . The following occupations were selected based on hourly wage estimates, training[,] and educational requirements for these occupations in the Chicago-Joliet-Naperville, IL Metropolitan Statistical Area:

1. DOT 166.264-037, Job Development Specialist, Sedentary pdl, SVP 6[;] Mean Wages: $33.62[;] Match Level: Fair[;] SOC 13-1071 Human Resources Specialists[.]

2. DOT 260.357-010, Commission Agent, Agricultural Produce, Sedentary pdl, SVP 6[;] Mean Wages: $ 33.62[;] Match level: Fair[;] SOC 41-4012 Sales Representatives, Wholesale, Manufacturing, Except Technician and Scientific Products[.]

. . .

VRC continued to research based on SOC and hourly median wages for Illinois using America's Career Infonet. The following was obtained:

[1.] SOC 13-1072 Human Resources Specialist (Occupation # 1 above)[;] Mean wages are $31.43 with 17% projected growth in IL through 2020.

[2.] SOC 41-4012 Sales Representatives, Wholesale, Manufacturing, Except Technician and Scientific Products (Occupation #2 above)[;] Mean wages are $32.68 with 5% growth projected in IL through 2020.

Of the SOC industries research, all support that there are sedentary positions which meet the wage of $30.16/hr.

(*Id*. at 87–88.) The assessment further defined a "fair match" to include "[j]obs that include similar work activities OR jobs in similar industries as the jobs the seeker has performed in the past. May require on the job training." (*Id*. at 87; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 38.) Ultimately, the Transferrable Skills Assessment concluded that "[a]fter [an] in-depth search using combined resources, the occupations identified would meet all the criteria; i.e.; [sic] capabilities, skills[,] and reasonable wage. A viable labor market exists." (*Id*. at 88.)

Aetna's May 2014 termination letter concluded, "[a]t this time, based on the above information, we have determined you are no longer disabled from performing any reasonable occupation and you [sic] claim is closed effective 5/27/2014." (R. 46-4, Admin. Rec., at 82; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 42.) Aetna informed Ms. Geiger that "[y]ou have 180 days from the date on this letter to ask us to review your claim by sending a written request. If you wait longer than that, you'll lose your right to have us review your claim. That means you'll lose your right to challenge our decision in court or anywhere else." (*Id*. at 83; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 44.)

### 5.    Ms. Geiger's November 2014 Appeal

On November 21, 2014, Ms. Geiger appealed Aetna's second termination. (R. 41, Geiger, 56.1(a)(3) Stmt. Facts, at ¶ 32; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 45.) Aetna received Ms. Geiger's appeal on December 1, 2014. (R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 45.) Ms. Geiger's appeal included, in part, legal arguments, medical records, examinations, and reports from Dr. Luz Feldmann, a pain treatment specialist, Dr. Debjani Roy, Ms. Geiger's primary care physician, and Dr. Mina Foroohar, a neurosurgeon, and witness statements. (R. 46-5, Admin. Rec., at 44–99; R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶¶ 32–33.)

On August 6, 2014, Dr. Luz Feldmann admitted that "[a]t this time, I do not evaluate for functional capacity. That type of evaluation would need to be completed by a physical therapist." (*Id*. at 101; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 46.) At a July 29, 2014 appointment, Ms. Geiger presented "persistent neck pain with radiation to the right." (*Id*. at 104.) Dr. Feldmann noted that Ms. Geiger "presents for followup [sic] of chronic pain. She takes Norco. The average pain over the past week was 6/10. The worst pain this past week was 8/10. The current pain relief makes a real difference for her. She notes improvements in

physical functioning, family relationships, social relationships, mood, sleep patterns[,] and overall function. Patient denies common side effects[.] . . . No aberrant behaviors have been noticed." (*Id*. at 102.) Dr. Feldmann referred Ms. Geiger to Dr. Mina Foroohar for further treatment. (*Id*. at 65.)

On October 16, 2014, Dr. Foroohar reported that Ms. Geiger's appointment was due to possible "neck pain, cervical degenerative disc disease and spinal stenosis." (*Id*. at 65.) Dr. Foroohar also noted, after a physical examination, that Ms. Geiger had "[n]ormal" posture and gait. (*Id*. at 66.) After examining both Ms. Geiger and Ms. Geiger's cervical X-Rays and MRI, Dr. Foroohar concluded, in part, that Ms. Geiger suffered from "[c]ervical spondylosis with stenosis, most significant at C5/6 and C6/7. EMG with C5/6 and C6/7 and C7/8 radiculopathy. Patient [Ms. Geiger] can consider surgery to include anterior cervical discectomy C5/6 and C6/7 with removal of osteophytes with allograft fusion with plating and instrumentation." (*Id*. at 68.) Ultimately, Dr. Foroohar did not restrict Ms. Geiger from working. (R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 49.)

On November 8, 2014, Mr. Robert Schnepf, one of Ms. Geiger's co-workers at AT&T in 1994, provided a witness statement. (*Id*. at 114; R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶¶ 34.) Specifically, Mr. Schnepf reported that, upon staying with Ms. Geiger in 2014, he observed Ms. Geiger's debilitating ankle pain and limitations. (*Id*.) On November 11, 2014, Ms. Cindy Wenseritt, one of Ms. Geiger's lifelong friends, submitted a letter, stating that "[t]his is an update to a letter I sent on December 21, 2012. I have only witnessed Donna's deteriorating more in the past 2 years. Nothing has changed. In fact, Donna has gotten worse." (*Id*. at 110.) Finally, on November 15, 2014, Ms. Lisa Winieckl, who has known Ms. Geiger for over fifty years,

similarly described how she had observed Ms. Geiger suffer from ankle pain and limitations. (*Id*. at 112.)

### 6.    Dr. Daniel Gutierrez Independent Peer Review and Responses

Upon receiving Ms. Geiger's November 2014 appeal on December 1, 2014, Aetna had Dr. Daniel Gutierrez, a board certified neurological surgeon, complete an independent physician peer review of, in part, Ms. Geiger's updated medical history and records.  (R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶ 35; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 47.)  On January 20, 2015, Dr. Gutierrez issued an initial peer review report.  (R. 46-5, Admin. Rec., at 34–43; R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶ 35; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 47.)  Dr. Gutierrez attempted to contact Drs. Roy, Feldmann, and Foroohar multiple times throughout the course of his peer review and never reached them.  (*Id*. at 40; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶¶ 58–60.)  In his initial report, Dr. Gutierrez first noted Ms. Geiger's ankle injury history and tests, beginning in 2010.  (*Id*. at 39.)  Specifically, he reported that Ms. Geiger had a history of "aseptic necrosis of the talus, juvenile osteochondrosis of the foot, tenosynovitis of the foot and ankle, and osteoarthritis of the foot and ankle status post L5-S1 discectomy, foraminotomy on 10/16/07, bilateral ankle arthroscopy on 1/14/10, and left total ankle replacement on 12/16/10."  (*Id*. at 38–39; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 48.)  Dr. Gutierrez also described the December 2013 and January 2014 Aetna video surveillance and activity report.  Specifically, Dr. Gutierrez stated,

> [s]urveillance video on 12/14/13 documented the claimant driving a SUC vehicle in snowy weather.  She was observed ambulating normally and fluidly without any gait abnormality walking into and from a convenience store.  The claimant repeated this multiple times on 12/14/14 [sic].  On 12/17/13 claimant was again observed driving her vehicle.  The claimant was briefly observed standing outside her vehicle.  The claimant was observed ambulating normally from her vehicle several times without any gait abnormality.  The claimant was observed carrying a bag in the right hand that was fairly heavy.  On 12/18/13 the claimant was again

observed driving her vehicle and ambulating normally from her vehicle to a store and back without any gait abnormality. . . . A surveillance report dated 01/31/14 revealed the claimant was observed operating her vehicle, shopping, and carrying a shopping bag in the right hand.

(*Id.* at 39–40; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 53.)

Dr. Gutierrez also reviewed Ms. Geiger's 2014 cervical spine impairment that occurred after Aetna's 2012 termination and subsequent reinstatement of Ms. Geiger's benefits. (*Id.* at 40.) Specifically, Gr. Gutierrez explained that

[t]he claimant saw Dr. Feldmann on 07/29/14 with complaints of chronic pain. Physical exam revealed decreased cervical range of motion. The claimant ambulated with a slow, limping gait. There was decreased range of motion of the left ankle with pain. The claimant was given a C6-C7 cervical epidural steroid injection.

Radiographs of the cervical spine performed 09/12/14 revealed minimal retrolisthesis of C5-C6 with loss of disc space height, endplate sclerosis, and anterior and posterior osteophytes.

MRI of the claimant's cervical spine performed 09/15/14 revealed minimal retrolisthesis of C5 with respect to C4 and C6, likely degenerative. There was very minimal degenerative anterolisthesis of C6 on C7. At C3-C4, there was minimal left unconvertebral hypertrophy contributing to borderline to minimal foraminal stenosis. At C4-C5, there was moderate right-sided unconvertebral hypertrophy contributing to moderate foraminal stenosis. At C5-C6, there was unconvertebral hypertrophy and posterior ridging with resultant severe right and moderate to severe left neural foraminal stenosis. At C6-C7, there was posterior ridging and small ventral extradural osteophyte disc complex, as well as unconvertebral hypertrophy. There was some flattening of the spinal cord with resultant moderate central canal stenosis. There was mild bilateral neural foraminal stenosis.

Electrodiagnositc studies performed 10/15/14 mild bilateral median sensory mononeuropathy across the wrists without denervation. There was acute to subacute bilateral moderate C5-C6 radiculopathy. There was acute severe bilateral C6-C7 radiculopathy. There was acute mild degree bilateral C7-C8 radiculopathy. There was electrophysiological evidence of polyneuropathy.

(*Id.* at 40.) Dr. Gutierrez also noted that Ms. Geiger's October 16, 2014 physical examination with Dr. Mina Foroohar "'revealed a normal gait,' intact cranial nerves, 4/5 strength in the right

intrinsics, and negative straight leg raising."  (*Id*. at 40; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 49.)  Dr. Gutierrez further noted, with respect to Ms. Geiger's cervical spine issues, that "[t]he claimant also presented with evidence of upper extremities mononeuropathy combined with an acute to subacute radiculopathy at multiple levels."  (*Id*. at 41.)  Indeed, Dr. Gutierrez explained that "[t]he claimant has been recommended for further surgery for multi-level radiculopathy and has a good prognosis for further functional improvement.  Based on the risks for post-operative chronic pain, a return to baseline status is very guarded[.]"  (*Id*. at 42.)

Ultimately, after "taking into account the claimant's observed functional level on surveillance videos as well as reported physical exam findings and diagnostic testing results," Dr. Gutierrez concluded that "the claimant does not have any profound functional impairments that are conclusively shown."  (*Id*. at 41; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 54.)  Further, Dr. Gutierrez found that "[t]he medical documentation supports the claimant could sit, stand, use hands/arms/fingers to function consistently for an 8-hour day."  (*Id*.)  Specifically, Dr. Gutierrez reported that

> [a]lthough there is tenderness to palpation and some weakness present on physical exam, this is not shown to affect the claimant in any significant way per the surveillance.  The claimant's surveillance videos taken in 2012 and 2013 demonstrated inconsistent findings with the claimant's records as there was no evidence of any substantial gait abnormalities and the claimant did appear to have intact strength of the upper extremities.
>
> There is sufficient diagnostic evidence of pathology that would support certain restrictions and limitations for the claimant from 04/02/12 thru 11/01/14.  This would include lifting or carrying objects up to 30 pounds occasionally.  The claimant demonstrated the ability to tolerate lifting and carrying objects up to 30 pounds on surveillance video.  The claimant could also reasonably stand and walk for 1 hour at a time followed by a 5-10 minute break to take stress of [sic] the ankles.  The claimant does have fairly significant necrosis and osteochondral pathology that would become very painful with prolonged standing and/or walking.

(*Id*.)  Dr. Gutierrez concluded that "[t]here are no significant functional impairments noted on exam or evident on surveillance video that would support the claimant is reasonably unable to sit, stand, use her upper extremities consistently through an 8 hour day with the restrictions and/or limitations outlined above."  (*Id*. at 41.)

On January 21, 2015, Aetna wrote to Drs. Roy, Feldmann, and Foroohar after they failed to respond to Dr. Gutierrez's January 13, 15, and 19 telephone inquiries.  (R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶¶ 58–60.)  Aetna sent Ms. Geiger's doctors Dr. Gutierrez's peer review report detailed above and the surveillance videos.  (*Id*.)  Aetna also asked them to respond with any points of disagreement, comments on Ms. Geiger's current medications and any side effects that reasonably affected her functional capacity, and additional clinical evidence or observations of their opinions that they have not previously provided.  (*Id*.)  Aetna informed the doctors that if they did not respond within five days, Aetna would assume that the doctors agreed with Dr. Gutierrez's peer review report.  (*Id*.)  Drs. Roy and Foroohar did not respond.  (*Id*.)  Dr. Feldmann did.  (R. 46-5, Admin. Rec., at 32.)

On January 23, 2015, Dr. Feldmann, Ms. Geiger's pain specialist, sent a one-page response to Dr. Gutierrez's peer review report.  Dr. Feldmann disagreed with three points:

1.    Ms. Geiger's level of activity described in the video and observations is a result of daily administration of substantial amounts of pain medications added to management. (I didn't find this clarification in your report.)

2.    Her restrictions with standing and walking should be more severe than what it is recommended [sic].  In my opinion she should not stand or walk for more than 15 minutes per hour.

3.    The impact of her recent acute cervical radiculopathy is not included in this report.  I do not think you have any of her related visits.

(*Id*.)

On February 16, 2015, Dr. Gutierrez completed another physician review report. (*Id*. at 25–29; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 61.) In his second report, Dr. Gutierrez notes Dr. Feldmann's concerns in the January 23, 2015 response. (*Id*. at 27.) Dr. Gutierrez also attempted to call Dr. Feldmann on February 6 and February 13, 2015 but did not receive a call back. (*Id*.) Ultimately, after "taking into account the claimant's observed functional level on the surveillance videos as well as reported physical exam findings and diagnostic testing results," reciting Ms. Geiger's medical history, and noting Ms. Geiger's ankle and cervical spine issues, Dr. Gutierrez again concluded that Ms. Geiger "does not have any profound functional impairments that are conclusively shown" and provided the same physical limitations listed in his first peer review report. (*Id*. at 28; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 64.)

### 7. Aetna's Final Determination

On February 24, 2015, Aetna informed Ms. Geiger that, after "reviewing Donna Geiger's appeal for the Long-Term Disability claim[,]" it "agreed with the original decision to terminate the benefit as of May 27, 2014." (R. 46-4, Admin. Rec., at 104; R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶ 39; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 66.) Aetna explained that "[w]e reviewed every document that Ms. Geiger, her doctor(s)[,] and/or your office submitted for the claim and appeal. While not every document will be specifically referenced in this letter, every document has been included in this review." (*Id*; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 67.) Aetna's determination, according to its letter, relied, in part, on Dr. White's 2012 Independent Medical Examination, Dr. Gutierrez's independent peer review and the subsequent responses and addendums, the December 2013 and January 2014 surveillance activity reports, the Transferrable Skills Assessment, and the Plan's relevant definitions and classifications. (*Id*. at 104–106.) Aetna also noted Ms. Geiger's ankle medical history and her recent cervical spine impairments,

observing that, at her October 16, 2014 appointment with Dr. Foroohar, "it was recommended that Ms. Geiger consider a C5-6 and C6-7 anterior cervical discectomy and fusion." (*Id.* at 104–105.) Ultimately, Aetna informed Ms. Geiger that, because she "fails to meet the current long-term disability plan definition of disability, the inability to work at any reasonable occupation solely because of illness or injury, she is no longer entitled to long-term disability benefits effective May 27, 2014." (*Id.* at 106; R. 51, Aetna 56.1(a)(3) Stmt. Facts, at ¶ 78.)

On April 30, 2015, Ms. Geiger filed the current lawsuit. (R. 41, Geiger 56.1(a)(3) Stmt. Facts, at ¶ 40.) Ms. Geiger asserts that Aetna's decision was arbitrary and capricious because Aetna "terminat[ed] benefits in the absence of medical improvement and . . . [did] not giv[e] consideration to her worsening medical condition when she challenged the benefit denial[;]" 2) "Aetna disregarded the impact of Geiger's severe pain on her ability to work[;]" and 3) "Aetna improperly relied on inconclusive surveillance evidence[.]" (R. 40 at 1–2.) Aetna cross-moved for summary judgment and counters that 1) "Plaintiff Donna Geiger failed to timely appeal Aetna's decision to terminate her long term disability benefits[,]"[2] and 2) its "decision to terminate [Ms. Geiger's] long term disability benefits under the any reasonable occupation standard of disability as set forth in Aetna's welfare disability plan with the Sprint/United Management Company as covered by the [ERISA] was not arbitrary and capricious." (R. 50 at 1.) The Court addresses the arguments below.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[2] The Court grants Aetna's cross-motion for summary judgment, finding that its termination of Ms. Geiger's benefits was not arbitrary and capricious, pursuant to ERISA, 29 U.S.C. § 1133, rendering Aetna's timeliness argument moot.

56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). "The mere existence of *some* alleged factual dispute will not defeat summary judgment." *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016) (quoting *Anderson*, 477 U.S. at 247-48).

In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation omitted); *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 349 (7th Cir. 2015).

## ANALYSIS

Ms. Geiger and Aetna cross-moved for summary judgment on the long-term disability termination issue and do not dispute any material facts. After reviewing both submissions, the Court agrees with Aetna and concludes that Aetna's decision was not arbitrary and capricious, pursuant to ERISA, 29 U.S.C. § 1133.

## I.     ERISA Standard of Review

"A denial of benefits normally is reviewed de novo 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 360 (7th Cir. 2011) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948,

103 L. Ed. 2d 80 (1989)); *see also Fontaine v. Metro. Life Ins. Co.*, 800 F.3d 883, 886 (7th Cir. 2015). "In such a case, the denial of benefits is reviewed under an 'arbitrary and capricious' standard." *Id.* (quoting *Hess v. Reg-Ellen Mach. Tool Corp. Emp. Stock Ownership Plan*, 502 F.3d 725, 727 (7th Cir. 2007)) (footnote omitted). Here, it is undisputed that the Plan vests Aetna with discretionary authority. (R. 41, Pl. 56.1(a)(3) Stmt. Facts, at ¶ 11; R. 50, Def. Mtn., at 7.) Thus, the arbitrary and capricious standard applies.

"Under the arbitrary and capricious standard, the reviewing court must ensure only that a plan administrator's decision 'has rational support in the record.'" *Edwards*, 639 F.3d at 360 (quoting *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006)). In other words, "[w]hen determining whether a decision to deny benefits was arbitrary and capricious, 'we look to whether specific reasons for denial [were] communicated to the claimant, whether claimant [was] afforded an opportunity for full and fair review by the administrator, and whether there is an absence of reasoning to support the plan's determination.'" *Green v. Sun Life Assurance Co.*, — F. Supp. 3d —, 14 C 4095, 2016 WL 861236, at *4 (N.D. Ill. Mar. 7, 2016) (quoting *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832–33 (7th Cir. 2009)). "Put simply, an administrator's decision will not be overturned unless it is 'downright unreasonable.'" *Edwards*, 639 F.3d at 360 (quoting *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006); *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 70 (7th Cir. 2005)). "Although our review is highly deferential, it 'is not a rubber stamp.'" *Cerentano v. UMWA Health & Ret. Funds*, 735 F.3d 976, 981 (7th Cir. 2013) (quoting *Holstrom v. Metro Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010)); *see also Edwards*, 639 F.3d at 360; *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003). Ultimately, the Court will uphold Aetna's decision under the Plan "as long (1) 'it is possible to offer a

reasoned explanation, based on the evidence, for a particular outcome,' (2) the decision 'is based on a reasonable explanation of relevant plan documents,' or (3) the administrator 'has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.'" *Edwards*, 639 F.3d at 360 (quoting *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)); *see also Exbom v. Cent. States, Se. & Sw. Areas Health & Welfare Fund*, 900 F.2d 1138, 1142–43 (7th Cir. 1990).

## II.    Aetna's Decision Was Not Arbitrary and Capricious

Aetna's decision to terminate Ms. Geiger's long-term disability benefits has a plethora of "rational support in the record." *Edwards*, 639 F.3d at 360.  In August 2012, Aetna terminated Ms. Geiger's benefits for the first time.  Ms. Geiger appealed and, upon further review, Aetna reversed its decision and reinstated Ms. Geiger's benefits in May 2013, reserving the right to continue to assess her eligibility.  Then, in May 2014, Aetna again terminated Ms. Geiger's benefits, and she appealed.  Upon reviewing this appeal, however, Aetna affirmed its decision and terminated Ms. Geiger's benefits.

Throughout the course of this claims process, Aetna conducted, in part, an initial claim assessment, an Independent Medical Examination, three Independent Physician Peer Reviews, a Comprehensive Clinical Assessment, a Transferrable Skills Assessment, activity report surveillance, multiple communications with Ms. Geiger's team of physicians, and even reversed its first termination after a holistic review of Ms. Geiger's medical history and claim application. Specifically, Drs. White, in 2012, McPhee, in 2013, Bukhalo, in 2013, Foroohar, in 2014, and Gutierrez, in 2014 and 2015, all either reported that Ms. Geiger had "normal" gait or concluded that she could perform sedentary work.  The surveillance videos, observed by the independent peer review physicians, Ms. Geiger's physicians, and the Court, directly conflicted with the

evidence supporting Aetna's 2012 reinstatement, at best, and evidence of improvement, at worst. Indeed, the surveillance videos, showing Ms. Geiger entering, operating, and exiting a Sport Utility Vehicle, entering and exiting stores, shopping, and carrying a full shopping bag and purse, directly refuted Dr. Cirincione's April 24, 2013 independent physician peer review report, as he specifically found that she could not work due to Ms. Geiger's "recommendation that [she was] non-weightbearing or at least partial weightbearing with cane or assistive devices during the [relevant period] of time." (R. 46-5, Admin. Rec., at 198.) Moreover, Aetna remitted Dr. Cirincione's contrary 2013 independent physician peer review report and Dr. Feldmann's 2014 response to Dr. Gutierrez who considered them and, ultimately, still found that Ms. Geiger could perform sedentary work for at least eight hours a day. Dr. Gutierrez even considered Ms. Geiger's more recent 2014 cervical spine impairments and still concluded the same. In light of this new evidence and the updated reports, Aetna also conducted a comprehensive clinical review and transferrable skills assessment and concluded that Ms. Geiger could perform at a sedentary work level and discovered at least two occupations that were "fair matches" to her previous position. Explicitly referencing the Plan, Aetna ultimately determined that this evidence demonstrated that Ms. Geiger was no longer disabled from performing "any reasonable occupation" and terminated her long-term disability benefits. Significantly, Aetna communicated all of this to Ms. Geiger in its first termination letter in 2012, its second termination letter in 2014, and its final decision letter in 2015. As described in further detail both above and below, the record illustrates that "specific reasons for denial [were] communicated to the claimant . . . [the] claimant [was] afforded an opportunity for full and fair review by the administrator, and . . . there [was not] an absence of reasoning to support the plan's determination.'" *Green v. Sun Life Assurance Co.*, — F. Supp. 3d —, 14 C 4095, 2016 WL

861236, at *4 (N.D. Ill. Mar. 7, 2016) (quoting *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832–33 (7th Cir. 2009)).

### A. Aetna Minimized Any Conflict of Interest

Ms. Geiger first asserts that "Aetna has treated Donna Geiger as its adversary rather than complying with its fiduciary obligations under ERISA as required by 29 U.S.C. § 1104(a)(1)." (R. 40 at 6.)  The Court interprets Ms. Geiger's argument as one alleging a "conflict of interest." Where, as here, a benefits plan vests discretionary authority in an administrator that is "authorized both to decide whether an employee is eligible for benefits and to pay those benefits," the resulting "conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008) (quoting *Firestone*, 489 U.S. at 115)).  Indeed, "'conflicts are but one factor among many that a reviewing judge must take into account.'" *Raybourne v. Cigna Life Ins. Co. of New York*, 700 F.3d 1076, 1082 (7th Cir. 2012) (quoting *Glenn*, 554 U.S. at 116).  A conflict of interest, however, "is a given in almost all ERISA cases[.]" *Marrs v. Motorola, Inc.*, 577 F.3d 783, 789 (7th Cir. 2009).  As such, it is "not the existence of a conflict of interest . . . but the *gravity* of the conflict, as inferred from the circumstances, that is critical." *Id.*  Importantly, conflicts "carry less weight when the insurer took active steps to reduce potential bias and to promote accuracy." *Raybourne*, 700 F.3d at 1082.  Specifically, the Court considers "the reasonableness of the procedures by which the plan administrator decided the claim [and] any safeguards the plan administrator has erected to minimize the conflict of interest[.]" *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 482 (7th Cir. 2009).

Aetna successfully implemented safeguards to minimize any existing conflict of interest. In its February 24, 2015 final decision, Aetna relied, in part, on Dr. White's 2012 Independent

Medical Evaluation, Dr. McPhee's 2013 Independent Physician Peer Review report, a 2014 Comprehensive Clinical Review, and Dr. Gutierrez's 2014-2015 Independent Physician Peer Review report. These independent reports concluded that Ms. Geiger could perform at a sedentary work level after either conducting their own physical examination or conducting a holistic review of Ms. Geiger's claim application and medical history. Further, Aetna and the independent reviewing physicians reached out to and relied on various reports from Ms. Geiger's own physicians, including Dr. Roy, her attending physician, Drs. Feldmann and Bukhalo, her pain specialists, and Dr. Foroohar, her neurosurgeon. Specifically, Dr. McPhee noted that Dr. Bukhalo confirmed that it was "very reasonable" to conclude that Ms. Geiger could function at a sedentary work level for eight hour work days with certain movement and physical accommodations. (R. 46-6, Admin. Rec., at 7.) Dr. Foroohar noted, as Dr. Gutierrez explained, that Ms. Geiger "'revealed a normal gait,' intact cranial nerves, 4/5 strength in the right intrinsics, and negative straight leg raising." (R. 46-5, Admin. Rec., at 40, citing R. 46-5, Admin. Rec., at 66.) Dr. Feldmann admitted that he does not review for functional capacity. (*Id.* at 101.) Aetna also conducted physical activity surveillance and sent the video to the independent physicians and Ms. Geiger's physicians, ensuring an objective assessment of the video's meaning. Finally, Aetna communicated to Ms. Geiger that it "reviewed every document that Ms. Geiger, her doctor(s)[,] and/or [her attorney's] office submitted for the claim and appeal." (R. 46-4, Admin. Rec., at 104.) Indeed, after terminating Ms. Geiger's benefits the first time in May 2014 and reviewing her appeal, Aetna reversed its own decision, reinstating her benefits according to the Plan. Aetna's reversal and reinstatement, independent evaluators, and communication with Ms. Geiger's physicians all illustrate a reasonable procedure with sufficient safeguards to prevent a detrimental conflict of interest. *See Majeski*, 590 F.3d at 482.

### B.    Aetna Presented Sufficient Evidence

Ms. Geiger next argues that "[t]here was no evidence whatsoever that Geiger had experienced any medical improvement." (R. 40 at 8.) Specifically, Ms. Geiger maintains that "Aetna's medical support was from a discredited, out-of-date report from Dr. McPhee, while current medical evidence showed she remained disabled." (*Id*.) Contrary to Ms. Geiger's assertion, however, Aetna, after its 2012 reinstatement conducted physical activity surveillance, a comprehensive clinical review, a transferrable assessment review, and another independent physician peer review, all presenting new evidence that both conflicted with Aetna's previous reinstatement and corroborated Dr. McPhee's 2013 peer review report.

Upon reinstating Ms. Geiger's benefits in August 2013, Aetna informed Ms. Geiger that its decision was "based on sufficient medical evidence to support a functional impairment which precluded the employee from performing the material duties of her *own occupation*[.]" (R. 46-4, Admin. Rec., at 51, emphasis added.) Now that Ms. Geiger had surpassed the first twenty-four months, however, Aetna informed Ms. Geiger that she must now remain "disabled" from performing any "reasonable occupation." (*Id*.) As described above, the Plan defined a "reasonable occupation" as one "for which you are, or may reasonably become, fitted by: education; training; or experience; and which results in; or can be expected to result in; an income of more than 60% of your adjusted predisability earnings." (R. 46-2, Admin. Rec., at 6–11.) Notably, Aetna reserved the right to "continue to monitor [her] disability status by periodically requesting updated medical and/or other documentation to verify [her] continued eligibility for Long-Term Disability benefits." (*Id*. at 53.)

Aetna employed that right and, in December 2013 and January 2014, conducted physical activity surveillance on Ms. Geiger's daily activities. As noted earlier, the Court has viewed

these videos. Just as Aetna communicated to Ms. Geiger in its May 28, 2014 second termination letter, Ms. Geiger was active, demonstrated the ability to enter, operate, and exit a Sport Utility Vehicle on a number of occasions, and shopped at multiple locations for extended periods of time—sometimes over an hour at a time—carrying a full shopping bag and purse. Significantly, Ms. Geiger did so without a noticeable limp, gait, or outward sign of pain or discomfort. In light of this new evidence, Ms. Geiger's benefits claim now presented "inconsistent information." (R. 46-3, Admin. Rec., at 72.) In addition, this new evidence partially corroborated Dr. McPhee's April 15, 2013 independent physician peer review report, disputing Ms. Geiger's argument that it is "out-of-date." (R. 40 at 8.) Moreover, as described earlier, the videos refuted Dr. Cirincione's April 24, 2013 conflicting report concluding that Ms. Geiger could not work, as he relied on Ms. Geiger's recommendation "that [she was] non-weightbearing or at least partial weightbearing with cane or assistive devices during the [relevant period] of time." (R. 46-5, Admin. Rec., at 198.) Thus, Aetna further investigated Ms. Geiger's eligibility.

As part of its investigation, Aetna submitted Ms. Geiger's claim to Ms. Judy Tierney, R.N. for a Comprehensive Clinical Review on April 7, 2014. Ms. Tierney reviewed, in part, Ms. Geiger's medical history, Aetna's video surveillance, Aetna and Ms. Geiger's telephone interview, Aetna's independent peer reviews, attending physician statements, and Ms. Geiger's claim history from 2009 to around January 2014. (R. 46-3, Admin. Rec., at 77–78.) After this comprehensive review, Ms. Tierney concluded that Ms. Geiger's file and "[t]he available medical would not support impairment greater than the reviews provided by Dr. McPhee and the claimant's pain management provider, Dr. Bukhalo on 4/12/13." (*Id*. at 83.) Put differently, Ms. Geiger could function at a sedentary level for eight hour work days. Aetna then took this information and conducted a Transferrable Skills Assessment to determine whether, in light of

Ms. Geiger's functional capacity, education, and work history, there was any reasonable occupation, as defined in the Plan, that Ms. Geiger could perform. Specifically, based on the newly acquired surveillance evidence, Dr. McPhee's now corroborated report, and the comprehensive clinical assessment, the Transferrable Skills Assessment utilized the following functional capacity:

> Sedentary work activity for an 8 hour day; reasonable restrictions would allow lift/carry 10 pounds occasionally and less than 10 pounds frequently; stand/walk occasionally; squat/crouch occasionally; hand use including handling and fingering would be unrestricted. Allowance for change of position to avoid prolonged sitting would be advisable.

(R. 46-3, Admin. Rec., at 84–85.) In addition, the assessment concluded that Ms. Geiger had the following transferrable skills: "[m]ak[ing] decisions and judgments[;] [i]nfluencing people in their opinions, attitudes, and judgements[;] [d]ealing with people[; and] [c]omputer skills[.]" (*Id.* at 86.) On April 24, 2014, Aetna learned that there were at least two "fair" matches: a position as a 1) Job Development Specialist in a Human Resources Department and 2) one as a Commission Agent in Agricultural Produce. (R. 46-3, Admin. Rec., at 84–88.)

Finally, after reviewing Ms. Geiger's appeal, Aetna remitted Ms. Geiger's entire claim file, including, in part, her updated medical history and records, Aetna's updated surveillance evidence, and Ms. Geiger's claim history, to Dr. Daniel Gutierrez, a board-certified neurosurgeon, for a third independent physician peer review. Dr. Gutierrez reviewed Ms. Geiger's entire ankle and spinal injury history, noted her numerous appointments with her team of physicians, attempted to communicate with her doctors, reviewed the December 2013 and January 2014 video surveillance, and considered Dr. Feldmann, Ms. Geiger's pain specialist's response to his initial report. Ultimately, Dr. Gutierrez concluded that Ms. Geiger's medical condition allowed her to perform a sedentary work level for at least eight hours a day.

Accordingly, despite Ms. Geiger's assertion otherwise, Aetna presented evidence that there was conflicting information regarding Ms. Geiger's medical condition. Indeed, only after a detailed review lasting from 2012 to 2015 did Aetna terminate Ms. Geiger's benefits. Significantly, Aetna described in its letters and supporting documentation the evidence detailed above, demonstrating that "'it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome,' [*and* that] the decision 'is based on a reasonable explanation of relevant plan documents[.]'" *Edwards*, 639 F.3d at 360 (quoting *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)).

### C. Aetna Considered Ms. Geiger's Cervical Impairment and Pain

Ms. Geiger, however, argues that her "her condition *worsened*," and that Dr. Gutierrez "focused exclusively on the ankle impairments in finding sedentary work capacity" and "ignored the cervical spine impairment and offered no comment whatsoever on its functional impact." (R. 40 at 9–10.) As noted earlier, however, Dr. Gutierrez *did* consider Ms. Geiger's cervical spine impairments in his 2014-2015 independent physician peer review. Indeed, Dr. Gutierrez reviewed and summarized the results of Ms. Geiger's appointments with Drs. Feldmann and Foroohar specifically regarding her cervical issues, stating, in relevant part,

> [t]he claimant saw Dr. Feldmann on 07/29/14 with complaints of chronic pain. Physical exam revealed decreased cervical range of motion. The claimant ambulated with a slow, limping gait. There was decreased range of motion of the left ankle with pain. The claimant was given a C6-C7 cervical epidural steroid injection.
>
> Radiographs of the cervical spine performed 09/12/14 revealed minimal retrolisthesis of C5-C6 with loss of disc space height, endplate sclerosis, and anterior and posterior osteophytes.
>
> MRI of the claimant's cervical spine performed 09/15/14 revealed minimal retrolisthesis of C5 with respect to C4 and C6, likely degenerative. There was very minimal degenerative anterolisthesis of C6 on C7. At C3-C4, there was minimal left unconvertebral hypertrophy contributing to borderline to minimal

foraminal stenosis. At C4-C5, there was moderate right-sided unconvertebral hypertrophy contributing to moderate foraminal stenosis. At C5-C6, there was unconvertebral hypertrophy and posterior ridging with resultant severe right and moderate to severe left neural foraminal stenosis. At C6-C7, there was posterior ridging and small ventral extradural osteophyte disc complex, as well as unconvertebral hypertrophy. There was some flattening of the spinal cord with resultant moderate central canal stenosis. There was mild bilateral neural foraminal stenosis.

Electrodiagnositc studies performed 10/15/14 mild bilateral median sensory mononeuropathy across the wrists without denervation. There was acute to subacute bilateral moderate C5-C6 radiculopathy. There was acute severe bilateral C6-C7 radiculopathy. There was acute mild degree bilateral C7-C8 radiculopathy. There was electrophysiological evidence of polyneuropathy.

(R. 46-5, Admin. Rec., at 40.) In his conclusion, Dr. Gutierrez reported that, after "taking into account the claimant's observed functional level on surveillance videos as well as *reported physical exam findings and diagnostic testing results*, . . . the claimant does not have any profound functional impairments that are conclusively shown." (*Id*. at 41, emphasis added.) Moreover, Dr. Gutierrez concluded that "[t]he *medical documentation supports* the claimant could sit, stand, use hands/arms/fingers to function consistently for an 8-hour day." (*Id*, emphasis added.) Dr. Gutierrez also described Ms. Geiger's cervical impairments in his second report on February 16, 2015. (R. 46-5, Admin. Rec., at 25–29.) Aetna also incorporated Dr. Gutierrez's reports into its review, as it explained in its February 24, 2015 final decision letter to Ms. Geiger. (R. 46-4, Admin. Rec., at 104.) Consequently, Ms. Geiger's claim that Dr. Gutierrez or Aetna failed to consider Ms. Geiger's cervical spine impairment is incorrect. Thus, the record refutes Ms. Geiger's claim that Aetna "cherry-pick[ed] the evidence and ignore[d] reliable evidence that supports the claimant's s disability." (R. 40 at 10.) Instead, the record illustrates that "the administrator 'has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.'" *Edwards*, 639 F.3d at 360 (quoting *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)).

Ms. Geiger next claims that "Aetna failed to give any consideration to the impact of Geiger's pain on her ability to work." (R. 40 at 11.) The record, however, also refutes this claim. In April 2013, Dr. McPhee reported communicating with Ms. Geiger's pain management provider, Dr. Bukhalo, specifically to determine whether a sedentary work level for eight hour days would be tolerable. According to Dr. McPhee, Dr. Bukhalo concluded that it would be "very reasonable." (R. 46-6, Admin. Rec., at 7.) Additionally, Dr. Gutierrez, in his 2014-2015 reports, specifically referenced Ms. Geiger's reported pain as documented in her medical records, providing,

> [t]he claimant saw Dr. Feldmann on 07/29/14 with complaints of chronic pain. Physical exam revealed decreased cervical range of motion. The claimant ambulated with a slow, limping gait. There was decreased range of motion of the left ankle with pain. The claimant was given a C6-C7 cervical epidural steroid injection.

(R. 46-5, Admin. Rec., at 40.) Acknowledging this pain, rather than ignoring it as Ms. Geiger alleges, Dr. Gutierrez concluded that,

> [a]lthough there is tenderness to palpation and some weakness present on physical exam, this is not shown to affect the claimant in any significant way per the surveillance. The claimant's surveillance videos taken in 2012 and 2013 [sic] demonstrated inconsistent findings with the claimant's records as there was no evidence of any substantial gait abnormalities and the claimant did appear to have intact strength of the upper extremities.

(*Id*. at 41.) Moreover, Dr. Gutierrez's prognosis even anticipated further pain and, as a result, provided limitations necessary to avoid it, stating

> [t]here is sufficient diagnostic evidence of pathology that would support certain restrictions and limitations for the claimant from 04/02/12 thru 11/01/14. This would include lifting or carrying objects up to 30 pounds occasionally. The claimant demonstrated the ability to tolerate lifting and carrying objects up to 30 pounds on surveillance video. The claimant could also reasonably stand and walk for 1 hour at a time followed by a 5-10 minute break to take stress of [sic] the ankles. The claimant does have fairly significant necrosis and osteochondral pathology that would become very painful with prolonged standing and/or walking.

(*Id*.)  After Dr. Gutierrez issued his report, Aetna also wrote to Ms. Geiger's physicians, Drs.

Roy, Foroohar, and Feldmann, inquiring, in part, what medications Ms. Geiger was taking and

whether they would have any impact on her functional capacity.  (R. 51, Aetna 56.1(a)(3) Stmt.

Facts, at ¶¶ 58–60.)  Aetna gave the physicians five days to respond before Aetna assumed they

agreed with Dr. Gutierrez's report.  Drs. Roy and Foroohar did not response.  Dr. Feldmann did,

but he did not address Ms. Geiger's medication as it relates to her functional capacity in a full

work day.  Aetna's letters to Ms. Geiger explicitly relied on these reports, illustrating Aetna's

acknowledgement of Ms. Geiger's pain.  Rather than ignore it, the record provides "rational

support" that Aetna and the independent doctors simply did not conclude that it would prevent

Ms. Geiger from performing sedentary work during an eight hour workday.  *Edwards*, 639 F.3d

at 360 (citation omitted).

> **D.      The Surveillance Video Does Not Render Aetna's Termination
>           Arbitrary and Capricious**

Finally, Ms. Geiger argues that the "surveillance offers no evidence whatsoever that

would justify a conclusion that Geiger could be able to work on a regular and consistent basis."

(R. 40 at 12–13.)  Ms. Geiger's argument is without merit.  The Court finds *Mote v. Aetna Life

Ins. Co.* instructive.  502 F.3d 601, 609–610 (7th Cir. 2007).  In *Mote*, the Seventh Circuit found

that an ERISA administrator's decision to terminate a claimant's benefits was not arbitrary and

capricious despite relying, in part, on surveillance video.  Specifically, the court held

> Mote then contends that Dr. Hall's opinion is suspect because he changed his
> conclusion after viewing the videotape snippets of her daily activities and that the
> Plan's consideration of the videotapes during its deliberative process was
> improper.  These arguments are without merit.  In *Shyman v. Unum Life ins. Co.*,
> 427 F.3d 452 (7th Cir. 2015), we considered an ERISA plan's denial of benefits
> decision, which partially was based on evidence gathered by a private detective
> that contradicted claimant's disability claims.  *Id*. at 456.  We did not object to the
> plan's surveillance of the claimant, and we held that the plan's denial was neither

arbitrary nor capricious. *Id*; *see also Dougherty v. Indiana Bell Tele. Co.*, 440 F.3d 910, 917 (7th Cir. 2006) (upholding ERISA plan's decision to terminate disability benefits after surveillance videotape showed the claimant engaging in normal, everyday activities, such as driving his car and hauling shopping bags).

*Id*. Here, as in *Mote*, Aetna's decision was, in part, based on surveillance tapes that presented contradicting evidence concerning Ms. Geiger's physical activity levels, limitations, and capabilities. Specifically, the videos, similar to those in *Dougherty*, depicted Ms. Geiger entering, operating, and exiting a Sport Utility Vehicle, shopping at various stores for extended periods of times, and carrying a full shopping bag and a purse. Contrary to Ms. Geiger's argument, Aetna did not exclusively rely on the surveillance to determine that she can perform sedentary level work on a regular basis. Instead, as described above, the surveillance video sparked a further investigation into her eligibility and the independent physician peer review reports considered them along with Ms. Geiger's entire medical history and claim file. Indeed, as noted earlier, the surveillance video corroborated Dr. McPhee's report that Ms. Geiger could perform sedentary work and refuted Dr. Cirincione's report that she could not due to her recommendation that she be nonweightbearing. Thus, the surveillance videos did not render Aetna's termination of Ms. Geiger's benefits arbitrary and capricious. In sum, the record demonstrates that Aetna's decision was far from "'downright unreasonable.'" *Edwards*, 639 F.3d at 360 (quoting *Davis*, 444 F.3d at 576; *Sisto*, 429 F.3d at 670). Accordingly, Aetna's termination was not arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Court denies Ms. Geiger's motion for summary judgment and grants Aetna's cross-motion for summary judgment.

**Dated:** June 24, 2016

ENTERED

AMY J. ST. EVE
United States District Court Judge